## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **JERI N. DAVIDSON,** | ) | |
| **A/K/A NICOLE EDWARDS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:20CV00007 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **SMYTH COUNTY SCHOOL BOARD,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| | ) | |
| Defendant. | ) | |

*Hilary K. Johnson, HILARY K. JOHNSON, P.C., Abingdon, Virginia, for Plaintiff; Jennifer D. Royer, ROYER LAW FIRM, P.C., Roanoke, Virginia, for Defendant.*

In this employment case, the plaintiff, Jeri N. Davidson, also known as Nicole Edwards, asserts claims against her former employer, the Smyth County School Board ("School Board"), under the Pregnancy Discrimination Act ("PDA") and the Americans with Disabilities Act ("ADA"). The defendant School Board has moved for summary judgment. For the reasons that follow, I will grant the motion.

I.

The following facts are taken from the summary judgment record.

In 2014, the School Board hired Davidson to be a teacher at Marion Middle School. She was initially hired on a probationary five-year contract. At the end of the probationary term, the School Board would decide whether to extend her

contract.  If the School Board elected to continue Davidson's contract, they would be required by Virginia law to grant her "continuing contract" status, which is "effectively tenure."  Def.'s Mem. Supp. Ex. 1, Carter Decl. ¶ 12, ECF No. 17-1.  In Smyth County, many teachers spend their entire careers working in the public schools, and the School Board therefore views its decision to grant continuing contract status as significant, as it reflects a long-term commitment.

From 2016–2018, Davidson received "exemplary" annual performance reports and classroom evaluations that assessed, among other things, her teaching capabilities, professionalism, student progress, professional knowledge, and curriculum development.  Pl.'s Resp. Opp'n Ex. A–C, ECF Nos. 22-1, 22-2, 22-3.  Specifically, following the 2016-2017 and 2017-2018 academic years, it was noted that she was always "very professional."  *Id.* at Ex. A at 4, ECF No. 22-1; *Id.* at Ex. B at 4, ECF No. 22-2.[1]

For most of her teaching career, Davidson did not receive any disciplinary actions or complaints.  However, Gary Roberts, her former supervisor and principal of Atkins Elementary School, stated that he had previously counseled Davidson about posting student information on social media after a parent complained.  He believed that afterwards she had changed her behavior and in 2013, he wrote a letter

---

[1] For clarity purposes throughout this opinion, I have cited to the ECF page numbers and not the page numbers shown on the documents.

of recommendation in support of her position at Marion Middle School.  Davidson disputes that Roberts ever counseled her about social media posts.

In April 2019, Davidson first informed her supervisor, Jennifer Sayers, the Assistant Principal at Marion Middle School, that she was pregnant and was due in November.  Def.'s Mem. Supp. Ex. 5, Davidson Dep. 10, ECF No. 17-5; *id.* at Ex. 2, Sayers Decl. ¶ 7, ECF No. 17-2.  She informed Sayers that her pregnancy was "very new, very normal," but that she was monitoring for pregnancy-related complications, "explain[ing] to her my previous pregnancy, I did have hypertension and we were watching for that."  Davidson Dep. 14, 15, ECF No. 17-5.

Sayers congratulated Davidson on her pregnancy and said that the entire staff was "very happy for her."  Sayers Decl. ¶ 7, ECF No. 17-2.  Maternity and parental leaves are common among the staff of the Smyth County School Division.  From 2017–2021, "twelve (12) employees [took] maternity leave and two (2) employees [took] paternity leave," without any issues.  Def.'s Mem. Supp. Ex. 4, Spencer Decl. ¶¶ 5, 6–8, ECF No. 17-4.  Of the 14, all are still employed, except for two who resigned during their maternity leave to stay home with their children full time.  *Id.* ¶ 6.  The school would typically not plan for a November birth until after the prior school year ended.

In May 2019, Davidson informed Sayers that she was "feeling tired," but she was still capable of performing the duties of her job.  Davidson Dep. 16-17, 71, ECF

No. 17-5.  On May 16, 2019, Davidson explained for the second time during a teachers' meeting in the presence of Dr. Kimberly Williams, the Principal at Marion Middle School, Sayers, and other teachers that she had "complications with [her] first pregnancy, and [she] would expect that same thing from this one, given [her] age." *Id*. at 11, 19.  Davidson says that she told her supervisors that she "experienced swelling" while on a recent school field trip on April 10, 2019, and that "this was going along the . . . same way as [her] previous pregnancy." *Id.* at 70.

In her declaration, Sayers claims that Davidson "never expressed to [her] that she was experiencing or had experienced any symptoms of preeclampsia with her then current pregnancy," or "concerns with high blood pressure, swelling, or lethargy or any other symptoms." Sayers Decl. ¶ 7, ECF 17-2.  Dr. Williams and Sayers both assert that as far as they knew and understood, Davidson was having a "normal and healthy pregnancy at all times that she was employed at the middle school." Def.'s Mem. Supp. Ex. 3, Williams Decl. ¶ 20, ECF No. 17-3; Sayers Decl. ¶ 7, ECF No. 17-2.  Davidson says that she never requested any pregnancy-related leave while employed by the School Board because she "had not been officially diagnosed" with preeclampsia or hypertension, and at the time, it was "only suspected." Davidson Dep. 67, ECF No. 17-5.

In her deposition testimony, Davidson stated that she had a second appointment with her doctors around mid-May, but that she "[didn't] know the exact

date." *Id.* at 15.  She further testified that "by [her] next appointment in May is when [she] had – [she] was showing signs of the hypertension." *Id*.  Her physician, however, produced no medical records prior to June.  Davidson stated that her second appointment was likely before her meeting with Dr. Williams and others, which occurred on May 16, 2019, and that she had a "medical app" on her phone that would confirm the exact date. *Id.* at 16.

Around this time, the school began to receive complaints from students and parents about Davidson's use of social media.  On May 15, 2019, Dr. Williams received a complaint from a parent about a Snapchat post made by Davidson.[2]  Specifically, "[t]he post had the comment 'Because stomping a mud hole in a parent's ass is frowned upon . . .' imposed over a photograph of a note the parent had written to Ms. Davidson.  At the bottom of the post was an avatar of a woman in a bee costume giving the middle finger."  Williams Decl. ¶ 6, ECF 17-3; Carter Decl. Ex. A, ECF No. 17-1.  On May 16, 2019, Dr. Williams received a second complaint about another Snapchat post from Davidson.  This post featured "a picture of student with special needs with an inappropriate comment about the student's exposed backside . . . something to the effect of 'Crack of the day.'"  Williams Decl.

---

[2] Snapchat is a multimedia instant messaging application that allows users to share pictures and messages, publicly or privately, which will automatically disappear after a certain amount of time. Wikipedia, *Snapchat*, https://en.wikipedia.org/wiki/Snapchat (last visited Jan. 14, 2021).

¶ 7, ECF 17-3.  Another teacher confirmed seeing the post and expressed concern that the student was recognizable to those who knew the student.  Davidson denies that people could identify the student, as the "photo was of the back of the student, and no part of his face was revealed."  Pl.'s Resp. Opp'n, Pl.'s Decl. ¶ 5, ECF No. 23-2.[3]  On May 17, 2019, Davidson was suspended with pay, pending an investigation into the social media allegations.

Separately, Dr. Williams and Sayers met earlier that month to discuss recommendations for teacher contract renewals for the next academic year.  In reviewing Davidson's contract, they discussed recent concerns about her performance.  Specifically, in February 2019, Dr. Williams began to worry that Davidson was not performing her yearbook obligations.  The school hired her to oversee production of the 2018-2019 yearbook, entering into a separate one-year contract that provided additional compensation.  Davidson Dep. Ex. 11, ECF No. 17-5.  Throughout March and April, Davidson represented to her supervisors that she was working hard on the yearbook and was on-target to complete her

---

[3] Plaintiff's lawyer has filed her own declaration, where she provides her opinion as to whether a student could have been identified from behind only by his black sweatpants. Pl.'s Resp. Opp'n, Johnson Decl., ECF No. 23-3.  Her opinion is based on her observations of middle-school students' attire when she picks up her grandson, a student at "a middle school in [the] area," on a fairly regular basis. *Id.* ¶¶ 2–3.  However, the declaration filed with the court is unsigned.  Plaintiff's lawyer did provide an unfiled courtesy copy of the declaration to chambers, which appears to be signed.  In any event, the lawyer cannot serve as a witness on the merits in the case, Va. R. Sup. Ct., Integration of the State Bar, Pt. 6, §II, Rule 3.7(a).

assignments.  However, in mid-April, after Davidson missed a few deadlines, Dr. Williams, Sayers, and Sherri Grubb, the yearbook publisher, met with her to discuss the project's status.  They requested that Davidson send to them completed yearbook pages by April 19, 2019.  Davidson never sent anything by that date, and Sayers believed that "no new work had been completed" since their last meeting.  Sayers Decl. ¶ 4, ECF No. 17-2.  Dr. Williams believed that Davidson was "lying to [her] about the status of the yearbook, was not forthcoming with her workload or ability to complete the work that she had taken on, and was hiding the fact that she was having difficulty performing all of her assigned tasks."  Williams Decl. ¶ 5, ECF No. 17-3.

Davidson disputes that she lied to or misled her supervisors.  She honestly believed that she could complete her assignments on time, despite delays in receiving club pictures and photos from the sports photographer.  She notes that she completed 85% of the yearbook.  Nevertheless, she admits that she missed deadlines, and ultimately, did not complete the yearbook.  At the end of April, Dr. Williams and Sayers re-assigned the project to another teacher for completion.  The yearbook was not printed until June 2019, after students had already left for summer break and the school received several complaints about its lateness.

Additionally, Sayers reported to Dr. Williams that she had other concerns about Davidson's professionalism and performance after receiving several

complaints of misconduct.  For example, on February 8, 2019, a student reported that during lunch, one student was required "to write 100 sentences using words that began with the letter 'd.'"  Sayers Decl. ¶ 3(a), ECF No. 17-2.  In front of students, Davidson joked, referring to two students, "Can you find the 'D,' Mr. Hutton? I'll bet Jill can find the 'D,'" which the students understood to mean "dick."  *Id.*  In the spring, a parent complained that Davidson referred to her child as a "hemorrhoid in my butt."  *Id.* ¶ 3(b).  Sayers says she asked Davidson about this comment, and Davidson replied that she was only joking.  Other parents complained that Davidson dressed inappropriately and yelled at students in the hallway.  Sayers further claims that Davidson put up a bulletin board in the classroom titled "The Wall of Shame" where she posted students' names and their failing math grades.  *Id.* ¶ 3(d).  Sayers says that she immediately informed the principal, who then "ripped it down."  *Id.* Based on all of these concerns, Dr. Williams recommended to the Smyth County School Superintendent, Dr. Dennis Carter, that Davidson's contract not be renewed.

In her affidavit, Davidson denies most of the accusations, including that she made inappropriate comments, dressed inappropriate, and sent "social media posts." Pl.'s Decl. ¶ 10, ECF No. 23-2.  However, she does not dispute that parents called the school to make complaints about her.  She merely asserts that much of the criticism was unfounded and can be traced back to one parent's frustration with her, after she required her son to receive additional math tutoring.  The parent thereafter

made derogatory comments about Davidson on social media, which she believes damaged her reputation in the community.

Davidson makes ambiguous statements in her declaration concerning her posting of students' work in her classroom. She first denies the claim of "displaying students' poor work on a wall of shame which never occurred." *Id.* She later admits that she "plac[ed] missing work or submitted work that did not have a name on the board," but after the principal objected, she "voluntarily removed it." *Id.* ¶ 23. Her declaration further conflicts with her deposition testimony. In her declaration, she described as false the accusation of "making social media posts I had never made," *id.* ¶ 10, but in her deposition admitted to sending the Snapchat posts in question. Davidson Dep. 22–23, ECF No. 17-5.

Following her suspension, Dr. Carter states that he interviewed Davidson as part of his investigation into the social media posts. Dr. Cole Spencer, the Human Resources Director for Smyth County Public Schools, and Dr. Chris Ballenger, the Assistant Superintendent, also attended the interview. Davidson admitted during this interview that she did send the Snapchat posts, but she defended her actions by explaining that the posts "disappear," and that they were not shared publicly, as she only sent them as private Snapchat messages to three individuals, all fellow teachers — Jill Eddy, Angela Reynolds, and Brandon Hutton. Davidson Dep. 22–23, 59, ECF No. 17-5; Spencer Decl. ¶ 12, ECF No. 17-4; Carter Decl. ¶ 7, ECF No. 17-1.

Following the investigation, Dr. Carter and Dr. Spencer determined that while Davidson's conduct did not violate the Family Educational Right and Privacy Act ("FERPA"), the infraction was "significant" and that "the behavior was unprofessional, and that it demonstrated a lack of professional judgment." Spencer Decl. ¶ 14, ECF 17-4; Carter Decl. ¶ 10, ECF No. 17-1. Davidson says that Dr. Carter never informed her about his views, but she does not deny his conclusions. Pl.'s Decl. ¶ 5, ECF No. 23-2. In determining what disciplinary action would be appropriate, Dr. Carter and Dr. Spencer also considered Davidson's prior disciplinary record and past performance. They also met with Dr. Williams and Sayers to discuss their recommendation on her contract renewal.

On May 22, 2019, Dr. Carter informed Davidson of his "intent to recommend to the Smyth County School Board nonrenewal of [her] probationary teaching contract." Carter Decl. Ex. B, ECF 17-1. He explained that he based his decision on the recommendation of Dr. Williams and Sayers, as well as the results of the investigation in the social posts. He noted that Davidson had admitted to making two profane Snapchat posts, one disparaging a parent and one mocking a student's exposed backside. On May 23, 2019, Dr. Spencer sent Davidson a second letter, confirming that her "probationary contract is being nonrenewed," and that her "suspension will continue through the end of the school year." Davidson Dep. Ex. 1, ECF No. 17-5. He reiterated again the reasons for the School Board's nonrenewal

decision: "[T]hose [social media] postings, and previous misrepresentations you made to your building administrators regarding fulfillment of your work responsibilities. . . ." *Id.*

On May 23, 2019, Davidson sent Dr. Carter a letter in response, requesting a restatement of the grounds for her dismissal. While not disputing the claims about social media posts or misrepresentations to her supervisors, Davidson argued that she did not take the picture of the student, and while it "has in fact been a difficult year," she emphasized "the positives," namely that her test scores were consistently "above expectations." Carter Decl. Ex. C, ECF 17-1. She said that she felt "singled out" because her "suspension took place the day after [she] made administrators aware that [she] would likely be needing additional time off in the fall." *Id.* She further argued that two other teachers who had also sent inappropriate messages about students did not face similar consequences. *Id.*

Along with her letter, Davidson provided copies of text messages sent by fellow teachers Jill Eddy and Brandon Hutton. Eddy sent a screenshot of a student's benchmark assignment, showing that the student had "scored a four and a half percent." Davidson Dep. 61, ECF No. 17-5. Eddy commented, "'this is the sperm that won' in reference to the test score." *Id.* at 61.

Davidson testified that Hutton sent screenshots of two students' work, but in the record, only one of the posts appears to be related to a student's work. In that post, Hutton

took a screenshot of a completed, fill-in-the-blank assignment.  The sentence to be completed by the student said: "As poor as a ____."  Davidson Dep. Ex. 12, ECF 17-5. The student filled in the blank with "rock."  *Id.*  Davidson testified that Hutton "was trying to misinterpret the spelling, the student's work said rock, I think he was implying something else."  *Id.* at 61.  But it is not clear what Hutton was implying.  At worst, it is only vaguely inappropriate, certainly as compared to Davidson's posts, which were obviously derogatory towards a particular student and parent.  The other post is a series of messages between multiple people, with the first individual expressing frustration that a female student had worn a shirt that exposed her stomach.  A second individual replies with a meme that appears to mock persons who are overweight.  First of all, it is not pellucid that Hutton sent the first message (or any of the messages).  But assuming that he did, no particular student is referenced, and the meaning of the meme is also not apparent.  In sum, neither of these posts make much sense, let alone provide an obvious comparator for Davidson's own misconduct.

On May 28, 2019, Dr. Carter responded that while Davidson "did not agree to taking a picture of a special education student," she did admit to posting a photograph.  Carter Decl. Ex. D, ECF No. 17-1.  Dr. Carter further explained that "[t]est scores cannot minimize or excuse a teacher's inappropriate conduct regarding parents, student[s], or representations to administrators."  *Id.*  Moreover, the other teachers had not received "prior reprimand[s] regarding social media postings," or "misrepresented to supervisors [the] completion of work tasks."  *Id.*  While Davidson

did not recall prior warnings, Dr. Carter said that he confirmed with her supervisor that when she worked at Atkins Elementary School "a parent reported a post you made online about her son's reading level and progress. You were warned orally then about your use of social media regarding students and your official duties." *Id.* Finally, Dr. Carter insisted that "[n]either the suspension nor the recommendation for nonrenewal is related in any way to your pregnancy or any request or need for leave." *Id.* While Davidson "did express to colleagues during a meeting last week a concern that you might need extra time at delivery based on your prior pregnancy and delivery experience, . . . no requests for leave [were] made at the time." *Id.*

On June 14, 2019, Dr. Carter advised Davidson in writing that the School Board had formally voted to adopt his recommendation not to renew her probationary contract based on the reasons set forth in his May 22 and May 28 letters. Her contract with the School Board officially ended on June 30, 2019.

On September 12, 2019, Davidson's physician, Dr. Melanie A. Leight, wrote a letter advising that Davidson should remain out of work for the duration of her pregnancy due to complications from "chronic hypertension." Davidson Dep. Ex. 6, ECF No. 17-5. On December 10, 2019, her physician, Dr. Jacquelyn Wentworth, provided Davidson with a letter, excusing her from work until May 15, 2020, "[d]ue to complications from her pregnancy." *Id.* at Ex. 8.

After filing a charge of discrimination with the Equal Employment Opportunity Commission and receiving a Notice of Right to Sue, Davidson timely filed this lawsuit on March 9, 2020. She alleges that the defendant did not renew her probationary employment contract because of her pregnancy and history of preeclampsia, in violation of the PDA (Count 1) and the ADA (Count 2). The defendant has moved for summary judgment, alleging that Davidson failed to establish that she was discriminated against on the basis of her pregnancy or any pregnancy-related medical condition. Specifically, as to Count One, the School Board argues that she was not qualified for the role and the facts do not give rise to an inference of discrimination. It contends that Davidson has failed to show that the School Board's legitimate reasons were pretextual. As to Count 2, the School Board argues that Davidson was not disabled within the meaning of the ADA. It contends Davidson also failed to show that she was qualified for her position at the time of the discriminatory act or that her contract was not renewed because of her disability. The parties have fully briefed the issues and the matter is now ripe for decision.[4]

II.

---

[4] I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties.  *Celotex Corp. v. Catrett ex rel. Catrett*, 477 U.S. 317, 322 (1986).[5]  "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  A fact is material if "its existence or non-existence could result in a different jury verdict." *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At the summary judgment stage, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to come forward and establish a specific material fact in dispute.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  In determining if a genuine issue of material

---

[5]  I have omitted internal quotation marks, citations, and alterations throughout this opinion unless otherwise noted.

fact exists, courts view the facts and draw all reasonable inferences in favor of the nonmovant.  *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255.   However, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."  *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021) (unpublished).

III.

A.  COUNT I – PREGNANCY DISCRIMINATION.

Davison's first claim is that the defendant discriminated against her on the basis of her pregnancy and pregnancy-related complications, in violation of the PDA.  Title VII prohibits an employer from discharging or refusing to hire an individual "because of" such individual's sex.  42 U.S.C. § 2000e-2(a)(1).  The PDA amended Title VII to provide that discrimination on the basis of pregnancy, childbirth, or related medical conditions is sex discrimination.  *Id.* § 2000e(k).  A pregnancy discrimination claim is analyzed in the same way as any other Title VII

sex discrimination claim.  *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998).

Because Davidson does not purport to have any direct evidence of discrimination, the parties proceed under the *McDonnell Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). First, a plaintiff must establish her prima facie case.  *Id.* at 802.  The burden then shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the adverse action.  *Id.*  Finally, the burden shifts back to the employee to demonstrate that the asserted justification is pretextual.  *Id.* at 803–05.

To establish a prima facie case of discrimination, a plaintiff must show "that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) her job performance was satisfactory; and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination."  *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (unpublished).  A plaintiff may establish the fourth prong by showing "similarly-situated employees outside the protected class received more favorable treatment."  *Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012).

The School Board does not dispute that Davidson can establish the first and third prongs of *McDonnell Douglas*.  Because she was pregnant, she was a member of a protected class, and because her contract was not renewed, she suffered an

adverse employment action.  However, the defendant argues that Davidson has failed to show that she was qualified for her position or that similarly situated employees were treated more favorably.  Even if she could establish her prima facie case, the School Board argues that Davidson has failed to show that its legitimate, nondiscriminatory justifications were pretextual.

I will assume, without deciding, that Davidson has produced evidence sufficient to establish her prima facie case of discrimination under the PDA.  *See Adams v. Trustees of Univ. of N.C.-Wilmington*, 640 F.3d 550, 559 (4th Cir. 2011); *Mandengue v. ADT Sec. Sys., Inc.*, No. ELH-09-3103, 2012 WL 892621, at *16 (D. Md. Mar. 14, 2012) (holding that "it is a common practice of the Fourth Circuit to assume, without deciding, that the plaintiff has established a prima facie case in cases where the employer has proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment").  Here, the defendant has proffered ample evidence of legitimate, nondiscriminatory reasons for the adverse action.  Specifically, the defendant produced numerous declarations and documents that show Davidson's contract was not renewed because they believed that she lacked professional judgment and the proper temperament to be a teacher, as well as the fact that her supervisors had lost confidence in her ability to do her job.  It is well established that poor job performance qualifies as a legitimate, non-discriminatory

reason for termination.  *Caban v. MET Lab'ys, Inc.*, No. JKB-17-1872, 2019 WL 2146915, at *13 (D. Md. May 16, 2019).

Because the defendant has met its burden, "the *McDonnell Douglas* framework — with its presumptions and burdens — disappear[s], and the sole remaining issue [is] discrimination *vel non.*"  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43 (2000).  "Once the question comes down to pretext, a plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Holland v. Wash. Homes, Inc.*, 487 F.3d 209, 214 (4th Cir. 2007).  In other words, the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason."  *Adams*, 640 F.3d at 560.

To prove pretext, a plaintiff "may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact."  *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019).  However, "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action."  *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 281 (4th Cir. 2000).

Unfortunately for Davidson, she has not put forth sufficient evidence to meet her pretext burden.  Davidson was the only witness deposed in this case.  She relies

primarily on her own testimony, as well as medical records. Her theory of pretext is basically that she was suspended the day after she informed her supervisors that she might need additional leave in the fall, given her risk of developing hypertension. She claims that the defendant wanted to avoid the expense of hiring a substitute or dealing with a potentially lengthy absence. As further evidence of pretext, she contends that she received only exemplary performance reviews during her tenure and that the defendant did not terminate similarly situated employees who also sent inappropriate messages but who were not pregnant.

First of all, "temporal proximity, without more, does not support a finding of pretext." *Jones v. UnitedHealth Grp., Inc.*, 802 F. App'x 780, 783 (4th Cir. 2020) (unpublished). This is particularly true here, given that the school authorities also received the complaints about Davidson's social media posts the very same week; in fact, the second complaint was received on May 16, 2019 — which is also the day before she was suspended. Davidson does not rebut this timeline. She also does not produce any evidence to support her claim that the school would incur substantial costs to hire a substitute or address other staffing complications.

Davidson's claim of pretext based on her past performance reviews is not persuasive to create a genuine dispute of material fact. An employee may point to evidence that she was performing at a level that met her employer's legitimate expectations to prove that her employer is lying about its proffered justification.

*Volochayev v. Sebelius*, 513 F. App'x 348, 353 (4th Cir. 2013) (unpublished). However, an employer has discretion to determine its own legitimate expectations for its employees. *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) (holding that "[i]t is the perception of the decision maker which is relevant.").  It is not for the court to "decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette,* 133 F.3d at 299.

Davidson has not put forth circumstantial evidence to show that she was meeting her employer's expectations at the time her contract was not renewed, or to cast sufficient doubt on the defendant's claim she was not performing satisfactorily. First, it is apparent from the documents themselves that the reports primarily assessed in-classroom conduct, but the school authorities were primarily concerned about Davidson's outside-the-classroom conduct.  In that regard, it is undisputed that Davidson twice posted profane and inappropriate comments about a student and a parent on social media, and that some parents made complaints about her — both legitimate bases for not renewing her contract, even if Davidson presumably finds them unfair.  The fact that Davidson claims that she never received a prior warning about her social media use, which may be true, does not cast doubt on the explanation's validity.

In any event, the reports concerned Davidson's performance from 2016–2018 but the relevant misconduct occurred in 2019, including the yearbook and "wall of shame" incidents.  While Davidson disputes the defendant's characterization of the bulletin board, it is undisputed that her principal at that time objected to some display of student work and as a result, Davidson had to remove it.  It is also undisputed that Davidson missed several yearbook deadlines and that she never completed her work, forcing her supervisors to re-assign the project and delaying its completion.  In other words, Davidson herself admits that her supervisors had concerns about her performance — concerns that mirror the defendant's proffered reasons for not renewing her contract.

The defendant's stated justifications are further supported by undisputed and consistent contemporaneous records.   On May 22, 2019, Dr. Carter informed Davidson in writing that her contract would not be renewed because she admitted to making profane and inappropriate social media posts about a parent and a student, which did comport with her "responsibility to ensure that content of [her] communications . . . is appropriate [and] and professional."  Carter Decl. Ex. B, ECF No. 17-1.   Davidson's supervisors lost confidence in her based on her failure to complete the yearbook assignment.  *Id.*  These same reasons were again reiterated in the May 23, May 28, and June 14 letters.  Davidson has not produced evidence that the defendant's reasons changed over time or were inconsistent. Davidson's own

speculation that the defendant manufactured these reasons, absent any evidentiary support, cannot support an inference of pretext.

Finally, Davidson argues that because two other teachers, Jill Eddy and Brandon Hutton, who also sent inappropriate messages about students were not fired, she is being "singled-out."  Davidson Dep. Ex. 3, ECF No. 17-5.  In other words, she contends there is an inference of discrimination because she was the only pregnant teacher and the only teacher terminated.  So-called "comparator evidence" may be used to show pretext.  *Caban*, 2019 WL 2146915, at *10–12, *14.  "Comparators must be 'similar in all relevant respects,' including being subject to the same supervisors and performance standards and having 'engaged in the same conduct without [meaningful] differentiating or mitigating circumstances.'"  *Id.* at *10 (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (unpublished)).  Critically, the plaintiff must produce evidence to establish a valid comparator.  *Haynes*, 922 F.3d at 223–24.  A plaintiff's comparison of her own similarities to others cannot, by itself, meet this burden.  *Hawkins,* 203 F.3d at 281.

Davidson has not produced any evidence to show that Eddy and Hutton were similarly situated, other than her own assertions that they all engaged in the same or similar unprofessional conduct.  She has not shown, for example, that Eddy or Hutton were similarly employed on a probationary contract, or that their five-year probationary term was ending at the same time as Davidson's contract.  She has not

shown that the School Board was also deciding at this time whether to grant Hutton or Eddy continuing contract status. In fact, Dr. Carter and Dr. Spencer attest that "one of those teachers was already on continuing contract status." Carter Decl. ¶ 19, ECF 17-1; Spencer Decl. ¶ 24, ECF 17-4.

In sum, Davidson has put forth no contrary explanation, supported by the evidence, that creates a genuine issue of material fact as to whether the defendant's proffered justification is pretextual. I find that no reasonable jury could find there was unlawful discrimination, when the record is replete with undisputed evidence that according to Davidson's employer, her contract was not renewed because of poor performance and they did not wish to enter into a long-term employment relationship with her. The defendant is therefore entitled to summary judgment on the PDA claim.

## B. COUNT II – ADA DISCRIMINATION.

Davidson's second claim is that the School Board discriminated against her on the basis of disability — preeclampsia — in violation of the ADA. The ADA prohibits discrimination against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To establish disability discrimination, an individual must demonstrate that (1) she has an ADA-covered disability; (2) she is a "qualified individual," meaning that she was able to perform the essential functions of her job;

and (3) her employer took an adverse action against her because of her disability. *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686–87 (4th Cir. 1997).

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 239 (4th Cir. 2016). "Major life activities" are defined as functions such as "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i) (2020). While pregnancy is generally not considered a "disability," a pregnancy-related complication may qualify if it substantially limits a major life activity. *Jeudy v. Att'y Gen., Dep't of Just.*, 482 F. App'x 517, 520 (11th Cir. 2012) (unpublished); 29 C.F.R. pt. 1630, App.

Davidson argues that she is disabled under the ADA's actual-disability prong because she suffered from hypertension (preeclampsia) that was ultimately so severe that her doctors recommended she stay home on bed rest during the final months of her pregnancy. Alternatively, she argues that she was disabled under the ADA's regarded-as prong because she informed the defendant that she would experience pregnancy-related complications based on her hypertension during her prior

pregnancy.  In response, the School Board asserts that even if extreme hypertension qualifies as a disability, she did not suffer from any symptoms or receive an official diagnosis at the time of the adverse employment action, nor was she substantially limited in her ability to perform major life activities.

It is certainly the case that preeclampsia or chronic hypertension are pregnancy-related complications that may qualify as physical impairments. However, the undisputed evidence shows that Davidson was not diagnosed with preeclampsia or hypertension until after the defendant decided not to renew her contract.   According to Davidson's own deposition testimony, she told her supervisor in April 2019 that her pregnancy was "very normal."  Davidson Dep. 14, ECF No. 17-5.  She later disclosed to her supervisor that she "was feeling tired," and that she "experienced swelling" while on a recent school field trip.  *Id.* at 17, 70, ECF No. 17-5.  However, neither of these statements indicate that Davidson was diagnosed at this time with hypertension or preeclampsia.

Davidson did indicate in her deposition that she had an appointment with her physician in May, around the time she "was showing signs of the hypertension."  *Id.* at 15.  But she never testified that she was officially diagnosed at this appointment, and despite agreeing to provide the defendant with the date of this appointment, presumably to determine whether she was diagnosed *before* her suspension and eventual contract nonrenewal, Davidson does not produce any other evidence.

Rather, the only evidence she does produce shows that, at the earliest, Davidson was diagnosed with hypertension in September, based on a letter from her physician recommending that she remain out of work due to "chronic hypertension." Davidson Dep. Ex. 6, ECF No. 17-5. Additionally, by her own admission, Davidson never requested any leave because that would have required a "firm diagnosis," and her health concerns at the time were "only suspected." Davidson Dep. 67, ECF No. 17-5. A suspected condition cannot qualify as a physical impairment.

Even if Davidson were diagnosed with hypertension or preeclampsia before her termination, or the court were to conclude that mere tiredness and swelling are pregnancy-related complications that qualify as physical impairments under the ADA, it is undisputed that Davidson was never limited in her ability to work or perform a major life activity. By her own admission, Davidson told her supervisors that while she "was feeling tired," it did not prevent her from performing the duties of her job. *Id.* at 16–17, 71, ECF No. 17-5. Thus, Davidson has failed to create a dispute of material fact that she was disabled under the "actual-disability" prong of the ADA.

Davidson also failed to show that she is disabled under the "regarded-as" prong of the ADA. An individual is regarded as having a disability if she has been subjected to a prohibited action because of an "actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life

activity." 42 U.S.C. § 12102(3)(A); *Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869, 876 (4th Cir. 2020) (unpublished). Her claim cannot succeed for the same reasons as her actual-disability claim.

First, she did not have an actual disability, as explained above. Second, Davidson has not created a dispute of fact that her supervisors perceived her as having an impairment. Dr. Williams and Sayers attest that they considered her pregnancy "normal and healthy." Williams Decl. ¶ 20, ECF No. 17-3; Sayers Decl. ¶ 7, ECF 17-2. Dr. Spencer attests that he "first learned of Ms. Davidson's history with preeclampsia with her first pregnancy after she filed a complaint with the EEOC." Spencer Decl. ¶ 10, ECF No. 17-4. Davidson's own deposition testimony confirms that she did not give her employer a reason to conclude otherwise, as she admits that she told them her then current pregnancy was normal and cautioned only that she *might* have complications in the fall based on her prior pregnancy. She mentioned only once that she was feeling tired, but explicitly confirmed to her supervisor that she was still capable of performing all of her duties. I find that the plaintiff's speculative statements about her own prognosis, without more, are insufficient to establish that the defendant regarded her as disabled.

In sum, because the plaintiff has failed to establish that she was disabled under the ADA, the defendant is entitled to summary judgment.

IV.

For the foregoing reasons, it is **ORDERED** that the Motion for Summary Judgment, ECF No. 16, is GRANTED.   A separate judgment will be entered herewith.

ENTER:   January 20, 2022

/s/  JAMES P. JONES
Senior United States District Judge